Thank you, Your Honor. I apologize for being late. I was having a spirited spotted owl discussion with one of your fellow panels down the street. How did the owl come out? We're going to do fish today. Chips over there, fish here. This morning, this case has been appealed following a decision by this court that the government's allocation of Pacific Whiting to the McCaw Indian Tribe lacked any scientific basis and was purely a political decision. The case was remanded for further consideration. After we requested that the court send the matter back to the agency for further rulemaking, our request was denied. Instead, the district court allowed the government to simply supplement the record and supplemented the record with two declarations. We are now back before you again, and I have four points I want to make this morning briefly. First will be a point with respect to the procedure below, the fact that it was not remanded for rulemaking. I would have preferred even that the regulation be vacated, but it was not, and proper procedures were not followed in our opinion. Secondly, the substantive question about whether the so-called sliding scale meets the requirements of the Magnuson Act, that is, it must be based on the best scientific information available. We believe it was still and continues to be a political decision. I also want to make one other point about the sliding scale that was not made in the briefs, and that is to analyze the reason why the sliding scale starts at the lower volume of fish at 17.5% and then goes to 14%, which is kind of the reverse, the way one would think about it logically. And finally, I would like to comment about the fact that this case is not moot and draw to the Court's attention the Federal Register Notice of April 30, 2004, Volume 69, page 23667 to the end, and it is the decision of the agency with respect to Pacific Whiting this year. A couple of points here are very important. One, the Pacific Whiting stock, after the agency did a biomass analysis, has determined that it is no longer overfished, that in fact 250,000 metric tons should be available to all fishermen in the United States. But secondly, and most importantly, I think, for consideration by this Court, it references the fact that the United States and Canada entered into an agreement with respect to the management of this fish, this particular stock of fish, in which they allocated, in catch numbers, 73.88% to the United States and 26.12% to Canada. Now, one of the central questions in this case, and we'll come back to this, is how much of the Pacific Whiting passes through the Macaw Usual and Custom Fishing Grounds? And we have varying opinions from the government, but one of them they refer to is the possibility, and I think the Macaw Tribe takes this position, all of the Pacific Whiting pass through their Usual and Custom Fishing Grounds. I guess the question that I think needs to be answered is, well, why then didn't we give half of it to the Canadians? If it all goes into their waters, why did we give them only 23%? And why have we decided that we believe that between 35% and 28% somehow go through the Macaw Fishing Grounds? There is no scientific basis for any of these conclusions, except probably for the U.S.-Canada decision, which I think is based on the best available scientific information. Let me begin with the remand. It is generally true that when a regulation is found to be unlawful, as this one was originally, it is usually vacated and remanded to the agency for further consideration. One of the issues that we have argued is that at no time, at no time, did the National Marine Fisheries Service ever spell out in a proposed regulation or a final regulation exactly why they thought the sliding scale was the best scientific information available. In fact, as our briefs point out, in 1996, after an independent, iterative process, they came to their own conclusion and said that based on biomass, far less percentage was available to the Macaw Tribe. Instead of having a regulation, Judge Rothstein simply allowed them to add these two declarations. Just at this point, I want to interject and ask you about, didn't the district court, if I understand this correctly, the district court did that, and I understand what you're saying. Was it the district court's conclusion that because the agency subsequently engaged in further rulemaking that utilized the same allocation method that the public received proper notice? Am I making, is that their best argument in response to that? I think that's their best argument. Why is that wrong? Well, the reason it's wrong is because what Judge Rothstein says is, well, the things that were stated in the record before my court in U.S. v. Washington, they referred to it in their regulation, and that was ad quic. And the fact is, is if you look at those references, it's like, well, what we said in U.S. v. Washington was the best available science. And what did you say? They didn't say there was, they only said, through Meatho, I believe his name was, that the allocation of the sliding scale was within the legal right. So we have a scientist giving a legal opinion. He didn't give a biological opinion. And he's the same person that said that that was too high in 1996. So what, the reason that her decision was wrong is because. It does seem to be a moving target. Well. Every day you ask what the best method is. Except for the fact that if you have stated something publicly on the record and given an opinion, and then later you change it. I think the cases basically say you better be very specific to set forth this particular considerations you went into, and exactly what conclusions you drew for the action you took. And I still say that if you step back and look at both those declarations, neither of them really come to any specific conclusion about the most important issue here, and that is, what's the data? The agency in 1996 used the data they had and said, biomass calculation. And by the way, that's the way all fisheries are managed. It's the way they're all managed. Biomass. Size, type, and location. And each year, the harvestable amount is determined on the basis of biomass. But for some reason, Judge Rothstein did not believe it was acceptable. But on the other hand, her job is to tell the agency whether they were arbitrary and capricious in the scientific opinions that they made. But in this case, we have an unusual situation where Judge Rothstein seems to be an arbiter of science in U.S.V. Washington, different than I think the standard should be in reviewing agency decisions. She, in fact, drew some conclusions about the biology of Pacific whiting, which were wrong. Flat wrong. They aren't like salmon. And the agency added this second opinion of Mr. Robinson, which is a classic, equivocal, self-contradictory, but I'm the National Marine Fisheries Service guy and I'm an expert and here's all this recitation, and it never comes to a conclusion about what is a scientific basis, what are the data points that they used to determine their conclusion. That's why it's so interesting about this 17.5 and 14. Why does their percentage go down when there's more fish available? There's no biological reason to that. None whatever. It's internally inconsistent. They say all the fish goes through their waters at one time or another into Canada. Well, then why do you get a lesser percentage as the amount increases? It seems to me that one would think that as more fish go forward, there'd be likely more fish than there are UNA. What is the record contained if all the fish go through at the same time? Isn't part of the criticism of biomass is that it may not be the best information available because if different amounts go through at different times, then taking the picture at a certain time isn't going to be accurate, right? Well, that's exactly what the National Marine Fisheries Service does that every year. They did it this year to say that the stock's no longer overfished. That's what they do. It's harvestable each season. They take the science that's available, they apply what is available, and they make the decision based on the record articulating the reasons why. That's how we make decisions about how many endangered species are out there, all kinds of things. We use this kind of modeling, and we do it not every year. Every couple years, we check the data, we look at it. The agency then draws a conclusion from the data and says it's either this or that, which is exactly the Greenpeace action case. So the agency can do that, but I don't know that that's a judicial decision. I think it's for the agency to do it in the first instance. What is troubling here is the agency seems to believe— The agency did do that in the first place here. They did that exactly in the first place. But the court didn't like that. They predicted that the court wouldn't like it. And then they reversed their opinion, concluding that the allocation method was more appropriate, right? They concluded— And then we said that—then we rejected the department's allocation on the basis that it had not based its decision on the best available evidence, right? Yes. And now what they're trying to do is bring in the best available evidence, and it's not the best. It's contradictory. It hasn't gone through what I think should be a full APA review. Well, the standard isn't whether you think it's the best, right? Certainly not. All right. Certainly not. But I pointed out some things that raised some real serious questions about the agency's determination. Number one, why did they do it different before? Number two, what was the reason for changing their mind? Purely politics. Needed a political decision, needed a settlement for a judge that they thought would be problematic for them, and they ignored the science. They haven't changed their mind. They haven't done anything to look into this in any detail. And now along comes this U.S.-Canada decision, which may raise a big question about any of their conclusions because it looks like not all the fish goes over to Canada. Twenty-three percent might. Does that mean that the vast majority pool up just south of Macaw or in the Macaw M&A? We don't know. We don't know any of these answers to these questions because they're not in the record. And so they don't have what I think is a rational basis in the science, in the scientific data, to conclude that this percentage is better than another percentage. And this is extremely important because it is that number. Even two to five percentage points are really important. And if the agency is going to make these kinds of decisions on the basis of, you know, politics, then, you know, surely. Oh, we've been making the same argument over and over and over again. I'll move on. Anything new you might want to hear from the government? Nothing, Your Honor. That covers my four points, I believe, adequately, unless there are further questions. Thank you. Good morning, Your Honors. My name is James Kilbourn. I represent the U.S. Department of Commerce and the National Marine Fisheries Service. With me at the council table is Mark Slonim representing the Makai Indian Tribe, and we intend to submit our time evenly ten minutes apiece. In this Court's 2002 decision, this Court upheld the framework regulation that the Commerce Department adopted, establishing and recognizing the tribal treaty fishery, recognizing the usual and custom fishing grounds, and establishing a procedure for the tribe to ask for yearly allocations of fish. What the Court remanded back was the specific allocation for the year 1999, concluding that the agency had not given a scientific justification in the record for that allocation. It directed, it basically gave two alternatives for the agency to pursue on remand. One was to adopt a new regulation, or the other was to adopt or to provide scientific justification for the 1999 allocation. In fact, the agency here did both of those things. It adopted just not one new rule. It adopted a new rule in each of three successive years, for 2002, 2003, and 2004, and it went through appropriate APA notice and comment procedures. It based its decision based upon scientific information. The plaintiffs here did not challenge those regulations, so the full administrative record of those regulations is not in the record currently before the Court, but parts of it have been submitted, and from the parts that have been submitted, you can tell that those determinations were based upon scientific judgments. So that alone satisfies the direction of this Court's 2002 direction to adopt a new regulation. Let me tell you where I'm a little bit troubled. Let's say if I make the argument, you know, you could look at this and say that no method seems clearly the best. Now, okay, accepting the fact that what the law requires is the best information available, should I be troubled by the fact that the Department's scientific conclusions directly contradict the Department's earlier conclusions about using the biomass approach? I know. It's like I understand that time changes, but like some consistency, and I think that's what co-counsel is pointing out, that on any given day. Let me explain it this way. Before the agency can make the determination about what scientific information is relevant, it first needs to decide what the appropriate legal framework is. The Magnuson-Stevenson Act requires NIMS to make allocation decisions that are consistent with law and that use the best scientific information available. In 1996, when NIMS first proposed the possibility, it did not adopt the biomass approach as its definitive approach, but it suggested that. The treaty right had not been defined. Subsequently, the treaty right has been defined, and that treaty right entitles the macaw to 50% of the fish that pass through the reservation through the usual and custom fishing areas. And the problem with the biomass approach is it does not square with the legal treaty right. And what Midwater consistently has done here is to ignore that the treaty right has been determined. The biomass approach But they're also raising, they're saying that your declarations are completely devoid of any further justification, as was required by the court on remand. How do you respond to that? I don't think that's true. If you take a look You know where I should look. If you take a look at the two declarations that were submitted in the remand proceeding are the Robinson Declaration and the Mathot Declaration, at tabs 24 and 25 of the Macaw Supplemental Excerpts of Record. They, in turn, attach declarations that were submitted in the U.S. v. Washington subproceeding that defined the treaty right. Those Mathot and Robinson declarations go through and explain, or recite and explain, the scientific basis for the allocation according to the sliding scale approach. Now, one thing I want to explain is the plaintiffs here have made quite a bit over the fact that NMFS has not established that all of the whiting passed through the usual and custom fishing areas and that there is some doubt as to how much actually passed through. We don't have to establish to a scientific certainty how many fish passed through. That scientific certainty is not the test. The test is the best available science. And the treaty right here, the amount of fish being allocated to the macaw, is based upon what they have requested. So if the macaw are requesting something that is less than their full treaty right, which is what is being done in this sliding scale approach, the 14 to the 17 percent is what the macaw themselves are requesting. And that isn't the full amount of their treaty right. So in order to basically show a scientific justification for the 14 to 17 percent, really there would have to be evidence in the record to show that twice the 14 to 17 percent, that is 28 to 34 percent of the whiting passed through the macaw UNA areas. And there is that evidence in these affidavits. The affidavits show that whiting migrate from Southern California up the coast and up as far as Canada, that it is the adult fish that migrate up that far, that they follow basically what's called the California current and they follow the continental shelf line, and that they migrate, when they migrate north, they are what's called a transitory feeding fish and they migrate back and forth. And the Robinson and Mathot declarations in turn review the declaration of Ransom Myers, a fisheries biologist, who talks about those fish being up in the macaw UNA area. And it is Ransom Myers' conclusion that all whiting passed through, at some point in their lifetime, passed through the UNA area. Now, the NIMS scientists may not agree that all passed through, but they agree that a substantial bulk of them passed through, and that substantial bulk is more than 50 percent, and that is more than enough to justify the 14 to 17 percent that NIMS has allotted to the macaw under the sliding scale approach. How many tons of fish is there between the allocations, the difference in the allocations between the two parties? Well, there is... Tons of fish, what are we talking about? There is a substantial amount of difference. I know. Anybody put a figure of how many tons? I think if you looked at the administrative record from the 1990s... You tell me. I'm going to give approximations. I think for 1999, the difference under the biomass approach, the biomass approach would have allocated approximately, and this would be illustrative, I think 9,000 metric tons or something like that, whereas under the sliding scale approach, they got 32,000 metric tons. I think those were the figures. Another side effect. Yes. Yes. 9 compared to 33. Yes. Now, under the sliding scale, the rationale of the sliding scale approach is it is actually a scientifically based allocation formula because as the numbers of fish go up, the macaw have said, we will take a smaller percentage of the fish. Now, in terms of gross numbers, 14% of 200,000 metric tons is certainly going to be larger than 17% of 100,000 metric tons. So if you're looking at the amount of fish they're taking under the sliding scale approach, they actually are getting a larger percentage of fish as the overall biomass of the fish improves or gets larger. But at no time is it more than 50%. And the evidence shows that there is a vast majority or bulk, as the affidavits demonstrate, of whiting fish that pass through the macaw UNA area. And this is substantiated by acoustic survey studies that NIMS has done, by where the fishing effort is concentrated, and by the scientific determinations of where these fish migrate. I am past my ten minutes, and I would like to reserve some time for my co-counsel here. Thank you. Good morning, Your Honor. Mark Slonim. I represent the macaw tribe. In this Court's 2002 decision, the Court essentially made two holdings. First, that the tribe is entitled under its treaty to 50% of the harvestable surplus that passes through its usual and accustomed grounds. And second, that in making allocations, NIMS must use the best available science. In response to the Court's decision, NIMS demonstrated both in the record for the 2002 and 2003 rulemakings and in the submissions to the district court that its allocations were based on the treaty and the best available science, not politics. In particular, NIMS explained that it rejected the biomass method because it was inconsistent with the treaty in multiple respects. And it made a scientific determination that the harvestable surplus passing through the tribe's usual and accustomed area was more than enough to support the allocations that had been requested by the tribe. The first problem with the biomass method was that it artificially limited the harvestable surplus of fish in the macaw area far below the actual amount of fish present in the area. Under the biomass method, NIMS did not consider all fish present in macaw's fishing area to be available for harvest there. Instead, it applied a coast-wide harvest rate and a small multiplier to reduce the harvestable surplus to a fraction of the fish that were actually in the macaw area. Now, NIMS defended this initially in 1996 on the grounds it was desirable to have a uniform harvest rate on all subgroups of fish up and down the coast. However, under the treaty right, under the conservation necessity standard, NIMS can't just say that fish that are there are not available for harvest. It has to have a legitimate conservation reason for making that kind of reduction. And from the beginning, it expressed doubt whether it could do that under the conservation necessity standard, in particular because a similar approach had been rejected in another case involving halibut. And as this court noted at page 719 of its decision, this was one of the reasons NIMS never actually implemented the biomass method. Then, Dr. Meyers showed... They spawn off of Baja, California in Southern California, and then they migrate north in the spring up to as far as Thomas Forest, Canada in the Queen Charlottes, and then they make a southern migration in November or so and return back to the spawning grounds. Is there a large harvest by the Mexicans? There's no harvest by the Mexicans. By anybody except the two parties here? Well, there's a U.S. harvest and there's a Canadian harvest, and then the U.S. harvest is divided between the treaty fishery, and then it's subdivided among the non-treaty fishery. I'm sorry? I should have mentioned Canadian, yeah. Is there any reason why there isn't a Mexican harvest? The fish are too small to harvest there, and they're not accessible to the Mexican fishery. In fact, they're not harvested off of Southern California either. The furthest south they're harvested has been Northern California, and most of the harvest now is concentrated off of Oregon and Washington. Like a sea bass or a roughy or what? I've never heard of a whiting. It used to be called hake, and then the name was changed for marketing reasons. What? Hake, H-A-K-E, and the name was changed, I think, for marketing reasons. The bulk of the market is the fish is made into surimi, which is a fish paste that's used to make imitation crab and products like that. You won't see whiting. Occasionally, we'll see a whiting fillet, but you typically won't see the fish in the supermarket. That's like Patagonian toothfish. When it was called Patagonian toothfish, nobody bought it. Right. Then they changed the name to Chilean sea bass, and it's now endangered. Right. Well, I mean, is that the fish that the Scandinavians call place? The Northern Europeans, P-L-A-C-E? I don't know. It's kind of a small, you know, white fillet. I don't know. I'm not familiar with that, Your Honor. I've never met one, have you? It's similar to pollock, which is harvested up in Alaska. What? To pollock, which is harvested up in Alaska, and the fisheries are similar. They're structured in a similar way. I can probably take judicial notice. None of us have eaten it. Okay. So, as I was saying, Dr. Myers addressed this issue, this problem with the biomass method, and he pointed out that there was no concept. This is fish for paste, huh? Yes. Yes, Your Honor. And then it's used to make other products, other, like imitation crab is the one that comes to mind. Is it for dog food? Not that I know of. I have people in the audience who could answer these questions. I sort of feel embarrassed standing up here guessing at the answers. Dr. Myers submitted an initial report in 1998, and then he did some further work, which is reflected in declarations he submitted in U.S. v. Washington. All of that information showed that this reduction of the fish present to the harvest rate wasn't necessary for conservation, and that, in fact, it would be desirable to harvest more of the fish in the Macaw area because they tend to be older and larger, and for conservation reasons associated with fisheries management, that's a better way to manage the fishery. What about, what's your response to Mr. Walsh's claim that the subsequent declarations were devoid of any further justification? I don't think Mr. Walsh read the declarations, if that's what he's saying, because the declarations lay out. I'm pretty sure he probably did. The declarations lay out all of the information on which nymphs relied. And on this point, Dr. Myers showed why the uniform harvest rate theory on which the biomass method was based was not necessary for conservation, wasn't supported by any literature, and that it would be more productive to harvest more of the fish in the Macaw area. Now, it is not- So are they devoid of justification in support of the allocation method? Is that what his argument is? I don't quite understand his argument. The sliding scale was the tribe's request. Under the framework regulation, there are almost 100 species of ground fish that nymphs manages. It doesn't allocate all those fish for the tribes until the tribes come forward and say, we'd like to harvest this species, and we'd like an allocation. So in this case, Macaw came forward, and they said, we'd like to harvest whiting, and this is our request for an allocation. So the issue for nymphs then is not, why did the tribe pick whiting? Why did they ask for these many fish?
judges: Pregerson, Ferguson, Callahan